# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JOSHUA U. GARDNER,** | ) | |
| Plaintiff | ) | Civil Action No. 2:22cv00008 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |
| | ) | |

### *I. Background and Standard of Review*

Plaintiff, Joshua U. Gardner, ("Gardner"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423. Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Gardner protectively filed his application for DIB on February 4, 2019, alleging disability as of May 1, 2018, based on carpal tunnel syndrome; numbness in both arms; right shoulder and elbow issues; joint issues; lower back pain and arthritis; right hip pain; pain; tinnitus; issues with eyesight and hearing; sleep apnea; post-traumatic stress disorder, ("PTSD"); anxiety; and night terrors. (Record, ("R."), at 99, 237-38, 290, 304, 323.) The claim was denied initially and upon reconsideration. (R. at 127-46.) Gardner then requested a hearing before an administrative law judge, ("ALJ"). (R. at 147-48.) The ALJ held a hearing on October 6, 2020, at which Gardner was represented by counsel. (R. at 99.)  By decision dated October 28, 2020, the ALJ denied Gardner's claim.  (R. at 99-115.) After the ALJ issued his decision, Gardner pursued his administrative appeals, (R. at 184-85), and the Appeals Council granted the request for review, vacated the hearing decision and remanded the case to the ALJ.  (R. at 121-22.)  Specifically, the Appeals Council stated the recording of the hearing was inaudible and, therefore, pursuant to HALLEX I-3-7-14F, the record was incomplete, entitling Gardner to another hearing.  (R. at 121.)

A second hearing was held on August 25, 2021, at which Gardner was, again, represented by counsel.  (R. at 40-67.)  Gardner testified he did not sleep well, noting he tossed and turned and woke himself up frequently "cussing and screaming" due to PTSD, anxiety and depression.  (R. at 46.)  He said his sleep difficulties made him "constantly late" for things, and he had to set multiple alarms to wake himself up because they sometimes became part of his military-type dreams. (R. at 46.)  Gardner

testified his anxiety and feelings of being overwhelmed caused him to miss several family gatherings, and he had not celebrated Independence Day since 2009 or 2010 because fireworks reminded him of being in Iraq. (R. at 46-47.) He said loud noises could trigger flashbacks. (R. at 47.) Gardner described anxiety attacks as having chest pain, shaking a little bit and feeling like he could not breathe. (R. at 47.) He said if there were too many people in the grocery store, he would not go in, and he would avoid public places as much as possible, noting that noises and chatter were overwhelming and reminded him of military experiences. (R. at 48, 50.) Gardner estimated he stayed home 90 percent of the time. (R. at 50.) He reported having chest pains and anxiety-related issues two to four times daily, but sometimes it would last for a whole day. (R. at 48-49, 59-60.) Gardner stated he had one or two good days weekly. (R. at 49.) He said his ability to stay on task and concentrate was interrupted by his anxiety and PTSD issues at least two-thirds of the workday. (R. at 49.) According to Gardner, once he began having an anxiety attack, he focused on how people viewed him. (R. at 49-50.) He testified he had received an overall service-connected disability rating of 80 percent, 70 percent of which was based on PTSD. (R. at 51.) Gardner testified he no longer could play guitar due to physical difficulties, which added to his stress. (R. at 53.)

By decision dated September 1, 2021, the ALJ denied Gardner's claim. (R. at 15-34.) The ALJ found Gardner met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2020.[1] (R. at 17.) The ALJ found Gardner had not engaged in substantial gainful activity since the alleged onset date. (R. at 17.) The ALJ determined that Gardner had severe impairments, namely PTSD;

---

[1] Therefore, Gardner must show he was disabled between May 1, 2018, the alleged onset date, and December 31, 2020, the date last insured, to be eligible for benefits.

schizotypal personality disorder; somatic symptom disorder; anxiety disorder; depressive disorder; thoracic and lumbar spine osteoarthritis and wedging; and residual effects of a right wrist/hand injury, but he found Gardner did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18-22.)

The ALJ found Gardner had the residual functional capacity to perform light[2] work, except he could frequently, but not constantly, reach, handle and finger with the right upper extremity; occasionally overhead reach, bilaterally; have no public interaction; have occasional interaction with others, such as co-workers and supervisors, but largely in brief, superficial contacts; have no direct contact with crowds of unfamiliar persons; and he could not work around sudden, excessively loud noises. (R. at 22.) The ALJ found Gardner was not able to perform any of his past relevant work through the date last insured. (R. at 31.) However, the ALJ found that, based on Gardner's age, education, work history and residual functional capacity and the testimony of a vocational expert, a significant number of jobs existed in the national economy that Gardner could perform, including the jobs of a routing clerk, a photocopy machine clerk and a mail sorter. (R. at 32-33, 61-62.) Thus, the ALJ concluded Gardner was not under a disability as defined by the Act through the date last insured, and he was not eligible for DIB benefits. (R. at 33-34.) *See* 20 C.F.R. § 404.1520(g) (2022).

After the ALJ issued his decision, Gardner pursued his administrative appeals, (R. at 232-34, 364-66), but the Appeals Council denied his request for review. (R. at

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2022).

1-5.) Gardner then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2022). This case is before this court on Gardner's motion for summary judgment filed October 20, 2022, and the Commissioner's motion for summary judgment filed November 8, 2022.

## II. Facts[3]

Gardner was born in 1980, (R. at 237), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c).  He has a high school education with one year of college, as well as training in welding and pipefitting. (R. at 291.) Gardner has past work experience as a pipefitter and a transportation manager.  (R. at 113-14.)  He served in the United States Army from July 1, 1999, to August 28, 2008, and is a veteran of the Gulf War.  (R. at 255.)  Gardner was discharged from active military duty on August 26, 2009, and he filed a disability claim with the Department of Veterans Affairs, ("VA"), on December 5, 2017.  (R. at 255, 257.)  In a decision dated September 21, 2018, Gardner was found disabled by the VA, effective November 30, 2017.  (R. at 255-61.)  Specifically, he was found to have an 80 percent overall service-connected disability, with 70 percent being based on PTSD and 10 percent based on tinnitus.  (R. at 255-56.)

In rendering his decision, the ALJ reviewed records from Dr. Robert McGuffin, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Andrew Bockner, M.D., a state agency physician; Berman Chiropractic Clinic; James H. Quillen Department of Veterans Affairs Medical

---

[3] Because Gardner challenges on appeal only the ALJ's findings with regard to his mental health impairments, the court will limit its discussion to the facts relevant thereto.

Center, ("VA"); Dr. Tuanzhu Ha, M.D., Ph.D., an acupuncturist; Johnson City Chiropractic Clinic; Wade Smith, M.S., a licensed senior psychological examiner; David Dietrich, Ph.D., a licensed clinical psychologist; Relaxing Palms; Princeton Healthcare Associates, P.C.; Mountain View Regional Medical Center; and Melinda M. Fields, Ph.D., a licensed psychologist.

On June 21, 2018, Gardner was seen at the VA for a primary care visit, which mostly focused on his physical impairments. (R. at 665.) It was noted that Gardner had diagnoses of depression, PTSD, panic disorder and adjustment disorder, but he declined a mental health referral. (R. at 665-66.) He was alert, oriented and pleasant with a flat affect. (R. at 666.) Gardner saw Chelsa Ervin, a social worker at the VA, on January 10, 2019. (R. at 643-44.) He stated his pregnant girlfriend had left, and he was very upset. (R. at 644.) He intended to file for custody of the baby, and he was in tears over the situation and speaking in what appeared to be random thoughts running together. (R. at 644.) Gardner declined to speak to a mental health provider. (R. at 644.) At a January 11, 2019, primary care visit at the VA, Gardner was alert, fully oriented and cooperative, with a normal mood and affect. (R. at 638.) On February 8, 2019, he saw Courtney L. Cook, Ph.D., a staff psychologist at the VA, by self-referral, for relationship stress. (R. at 629.) Gardner was alert and fully oriented, pleasant and cooperative, with no hallucinations or delusions; he was well-groomed, with appropriate hygiene; he had an anxious mood, but improved from the prior session, with a congruent affect; thought content and thought processes were normal; his thoughts were more organized compared to the prior session; deficits were observed with judgment and insight; eye contact was appropriate; speech was normal and improved over the prior session, although hyperverbal; and psychomotor skills were normal. (R. at 630.) He reported his ex-girlfriend, from whom he "split" in July, was pregnant. (R. at 630.) Cook noted that Gardner requested a mental

health appointment at a primary care visit the previous day, due to relationship stress, and during which he was very anxious and disorganized. (R. at 630, 633.) With Cook, Gardner discussed details of this recent relationship stress, including financial stressors, a breakup, later learning his girlfriend was pregnant with his child after she told him she could not conceive and his plans to pursue custody of the child. (R. at 630-31.) Gardner stated he had not confirmed the pregnancy, but he was building a home for he and the baby, which was due the following month. (R. at 631.) Despite having a 70 percent service-connected disability based on PTSD, Gardner denied any inpatient or outpatient mental health treatment or current medications. (R. at 631.) He stated he previously had been on multiple medications, but he took CBD oil since 2015, which was very helpful for his depression, anxiety, sleep, appetite and physical health. (R. at 631.) Gardner reported he did not get enough sleep, he could not trust anyone, and he quit drinking alcohol in December 2017 due to an ulcer. (R. at 631.) Cook diagnosed PTSD and other problem related to psychosocial circumstances. (R. at 631.) Gardner was not interested in pharmacotherapy, but he was amenable to psychotherapy with Cook, which she scheduled for the following week. (R. at 632.)

When Gardner returned to Cook on February 14, 2019, he was fully alert and oriented, pleasant and cooperative, with no hallucinations or delusions; he was well-groomed, with appropriate hygiene; he appeared more at ease with the provider; he had a depressed mood, with a congruent affect and was tearful at times; thought content and thought processes were within normal limits; he was significantly more organized than his initial interaction with Cook; and judgment and insight were within normal limits, with improvements observed. (R. at 620.) Gardner discussed social distress, reporting he was working with an attorney to sue his ex-girlfriend for parental entrapment and emotional abuse, as well as seeking custody. (R. at 620.)

He also stated he had a car accident case. (R. at 620.) Gardner stated his attorney said therapy would "help his case." (R. at 620.) He said he hoped to have DNA testing shortly after the baby was born. (R. at 621.) Gardner reported anxiety at times about things not working out and about running into his ex at the VA, as she also received care there. (R. at 621.) Cook diagnosed PTSD and other problems related to psychosocial circumstances. (R. at 621.) At an eye appointment on the same day, Gardner listed playing guitar and jewelry making as hobbies. (R. at 622.) He was described as alert, fully oriented and pleasant at that time. (R. at 624.) On February 21, 2019, when Gardner returned to Cook, he was alert, fully oriented, pleasant and cooperative, with no delusions or hallucinations; he was well-groomed, with appropriate hygiene; his mood vacillated between euthymic and spontaneously tearful, with a congruent affect; thought content and thought process were within normal limits; judgment and insight showed potential deficits; eye contact was appropriate; and speech was normal. (R. at 612-13.) Gardner continued to discuss relationship difficulties with his ex-girlfriend, stating she should be due to give birth to their son the following month. (R. at 613.) Cook recommended long-term therapy, as this issue was unlikely to resolve soon, to which Gardner was amenable. (R. at 613.) Cook's diagnoses remained unchanged. (R. at 613.) The same day, during a primary care visit at the VA with Dr. Alex Qader, M.D., Gardner denied suicidal and homicidal ideations, and he was cooperative, with a normal mood and affect. (R. at 608, 610.) He was diagnosed with depression, among other things, which Dr. Qader indicated was managed by "behavioral/psychology." (R. at 610.)

Intake for outpatient psychotherapy occurred on March 14, 2019, with Meagan R. McPherson, Psy.D., a clinical psychologist. (R. at 537.) Gardner told McPherson his depression began when his ex-girlfriend "pushed me away. That is when [it] hit me full force. That was in July 2018." (R. at 537.) He reported no

history of mental health treatment, and he reported taking no medication. (R. at 537, 541.) Gardner stated he was living with his sister until he completed a house he was building. (R. at 538.) Regarding his work status, he reported he was "selling my art. I used to make jewelry and then I got depressed in 2/2018." (R. at 539.) Gardner stated he wanted to go to a holistic healing school in Asheville, North Carolina, or become a reiki practitioner. (R. at 539.) He endorsed financial stressors, including a previous motor vehicle accident, and he stated he had three attorneys and a private investigator – one for a custody case, one for his Social Security claim and one for his motor vehicle accident. (R. at 540.) Gardner stated he had sold his guitars, the art he had collected and all his coins just to build his house. (R. at 540.) On mental status examination, he was wearing soiled clothing; he had a depressed and irritable mood/affect; he had non-pressured speech of a halting nature; language was grossly intact; he had circumstantial, loose associations and neologisms; tangential thought processes; he denied suicidal ideations, homicidal ideations, current hallucinations, grandiosity and obsessions; judgment and insight were fair; he was fully oriented; he was aware of current events; he had no apparent deficits of attention/concentration; and memory was grossly intact. (R. at 541.) McPherson diagnosed adjustment disorder with anxious distress; and rule out personality disorder (schizotypal, narcissistic traits), and she scheduled him to return the following week. (R. at 542-43.) When he returned on March 22, 2019, Gardner was alert and fully oriented with a dysphoric mood and congruent affect; thought processes were circumstantial, vague in content and marked by magical thinking. (R. at 576.) Gardner discussed his belief that his ex-girlfriend had delivered what he believed to be his son. (R. at 577.) He reported an independent functional status. (R. at 577.) McPherson diagnosed Gardner with adjustment disorder with depressed mood; and schizotypal personality disorder, and she recommended he continue weekly psychotherapy. (R. at 576-77.)

On May 30, 2019, Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), of Gardner in connection with the initial consideration of his claim. (R. at 72-73.)  He concluded there was insufficient evidence to assess the "B Criteria" and the "C Criteria" of the Listings. (R. at 73.)  Specifically, Leizer stated that no activities of daily living were received, despite multiple attempts to contact Gardner and his representative. (R. at 73.)

On July 25, 2019, Gardner had a telephone contact with McPherson. (R. at 757.)  She noted Gardner's schizotypal personality disorder and adjustment disorder with anxiety were stable at that time. (R. at 758.)  He denied suicidal and homicidal ideation. (R. at 758.) Gardner expressed his desire to gain custody of his four-month-old son, who was residing in a homeless shelter for women in Ohio with the baby's mother. (R. at 758.)  He reported anxiety related to when he would get to bond with his child and regarding the baby's living conditions. (R. at 758.) McPherson noted Gardner was using effective problem-solving strategies and was engaging in positive self-care, and she scheduled another phone contact for August 1, 2019. (R. at 758.) However, when she attempted to contact him on this date, Gardner's phone was not accepting calls. (R. at 758.) When Gardner presented to the emergency department at the VA on August 23, 2019, with complaints associated with an upper respiratory infection, he was alert, fully oriented and cooperative, with appropriate mentation. (R. at 749-51.)

Gardner completed a Function Report on July 29, 2019, stating, among other things, that he did a yoga/stretching routine each morning when he got up to relieve

back pain.[4] (R. at 312-19.) He then would take a walk before eating breakfast. (R. at 312.) Gardner reported he spent most of the day resting and off his feet, but performed an additional yoga session prior to returning to bed. (R. at 312.) He stated that he, along with his sister, helped care for his dogs. (R. at 313.) Gardner stated his anxiety and "nerves" disrupted his sleep. (R. at 313.) He stated he prepared his own meals on a daily basis. (R. at 314.) Gardner stated he swept, dusted and picked up around the house daily. (R. at 314.) He also stated he went outside daily, and he was able to drive a car and shop in stores twice monthly for 10 to 15 minutes each time. (R. at 315.) Gardner further stated he could pay bills, count change, handle a savings account and use a checkbook/money orders. (R. at 315.) He listed his hobbies as playing guitar, making jewelry and participating in martial arts; however, he stated he no longer did the latter two, and he played guitar only once weekly. (R. at 316.) Gardner stated he spent time with family and friends about twice monthly, and he went to the healing arts center once or twice monthly for group meditation. (R. at 316.) He said he used to spend far more time with family and friends, and he often would meet friends to play music, which he no longer did. (R. at 317.) Gardner stated he had problems getting along with others, noting he got into arguments and verbal confrontations about politics. (R. at 317.) He reported his conditions affected his memory, concentration and ability to follow instructions and get along with others. (R. at 317.) In particular, Gardner stated his memory had become very unreliable, noting that memory loss is a symptom of PTSD. (R. at 317.) Thus, he said this caused difficulty following instructions. (R. at 317.) Gardner also stated he had noticed difficulty concentration/remaining focused, and he had difficulty getting along with others and became easily frustrated. (R. at 317.) Gardner noted he did well with written instructions, but had issues forgetting what

---

[4] This Report states it was completed by "Terrance Turner per Joshua Gardner." (R. at 319.)

he was told.  (R. at 317.)  He reported "no issues" getting along with authority figures, and he denied ever being fired or laid off from a job due to problems getting along with others.  (R. at 318.)  Gardner stated he did not handle stress well due to PTSD, but he had "no issues" handling changes in routine.  (R. at 318.)  He stated he had not been able to participate in Independence Day activities since serving in the military, noting he became nervous around lighters being ignited, and he could not eat in restaurants unless he could view the entire room from his seat.  (R. at 318.)

On September 12, 2019, Gardner requested to see a new therapist at the VA. (R. at 788.)  On September 17, 2019, he had a telephone encounter with Paula L. Sorensen, L.C.S.W., a licensed clinical social worker at the VA, stating he "just needs to talk to someone," and he indicated that monthly meetings would be sufficient.  (R. at 788.)  An appointment with Sorensen was scheduled for later that week, but Gardner canceled that appointment due to fracturing a toe and needing to stay off his foot.  (R. at 788-89.)  When he saw Sorensen on September 25, 2019, he shared his history of dysfunctional relationship with his ex-girlfriend and his distress over having no contact with his five-month-old son after the breakup.  (R. at 789.) Gardner reported an upcoming court hearing in Ohio regarding "false charges" his ex-girlfriend was claiming.  (R. at 789.) He also reported being busy buying and preparing to furnish a home.  (R. at 789.) Sorensen diagnosed schizotypal personality disorder; and adjustment disorder with anxious mood.  (R. at 790.)  When Gardner returned on October 10, 2019, he had a bright affect, and he shared photos of him with his son after the Ohio court hearing.  (R. at 792.)  He reported feeling supported and emotional about his ex-girlfriend's family welcoming him into their lives, and he spoke about a temporary visitation arrangement and upcoming court dates in November and January.  (R. at 792.)  Gardner stated he was supposed to close on his

house that day or the next, and he stated that others see "the new color in me." (R. at 792.) Sorensen's diagnoses remained the same. (R. at 792.)

On October 23, 2019, Gardner saw Wade Smith, M.S., S.P.E., a licensed senior psychological examiner, and David Dietrich, Ph.D., a licensed clinical psychologist, for a psychological evaluation, at the referral of Disability Determination Services. (R. at 779-83.) Smith noted Gardner was appropriately dressed, he was cooperative, and rapport was established and maintained throughout the interview. (R. at 779.) Gardner stated he was petitioning the court for custody and visitation of his six-month-old son who lived in Ohio with the mother, and traveled there every two weeks to see him. (R. at 779.) Gardner currently lived alone in a house he just purchased one day previously. (R. at 779.) He reported his most recent employment was as a mason, three weeks previously, for three days. (R. at 780.) However, his last sustained job was as a pipefitter and welder, which he quit in 2015 because he felt depressed and lonely from traveling for work. (R. at 780.) Gardner denied ever having been fired from a job. (R. at 780.) He reported he had just begun seeing a counselor in Ohio as part of his attempt to gain custody of his son, but no other counseling or psychiatric consultations were reported, and he denied any psychiatric hospitalizations. (R. at 780.) Although Gardner reported taking Xanax for five months while serving in Iraq, he divulged no other instances of pharmacotherapy. (R. at 780.) Gardner reported activities of daily living, including yoga; walking; reading books about science and physics; watching documentaries about war or ancient cultures; listening to music and occasionally playing guitar; watching videos, listening to music and reading science articles on YouTube; bathing daily; grocery shopping weekly; visiting several friends weekly; managing a bank account and paying bills by arranging auto-drafts; and performing household chores, including dusting, sweeping, mopping, loading the dishwasher,

laundry, taking out trash and cooking.  (R. at 781-82.)  Smith concluded that Gardner demonstrated normal psychiatric independence in his daily activities, and he performed a moderate range of activities with effectiveness, appearing to choose his activities appropriately.  (R. at 782.) However, he further noted that the sustainability of Gardner's activity level seemed contingent on his physiological state.  (R. at 782.)

On mental status examination, Gardner was alert and fully oriented, and he made appropriate eye contact; he had good hygiene and grooming; no psychomotor abnormalities; he was not seen as exaggerating his symptoms for the purpose of gaining disability benefits; mood was reported as "I'm a little depressed from dealing with … physical issues," and currently "blah," but affect was calm, stable, full range, normal intensity, congruent to content and fully reactive; speech was normal rate, rhythm, volume and articulation, as well as fluent and grammatical, but intonation was somewhat flattened; there was no looseness of associations or other symptoms of a formal thought disorder; he denied suicidal/homicidal ideation, and no hallucinations or delusions were elicited; attention appeared intact; concentration for short-term tasks was intact; he could spell "world" backwards; he slowly completed Serial 7s with two errors in 13 calculations, requiring one minute 56 seconds; short-term memory was intact, evidenced by recalling 3/3 words after five minutes; recent and remote memory were intact, as evidenced by recall during the interview; numerical reasoning was efficient and generally accurate; intelligence was in the average range; and mini-mental state score was 24/25.  (R. at 780-81.) Smith found that Gardner related appropriately to him, and he reported having good relationships with family members. (R. at 782.) Gardner also stated he had two close friends, he was close to one relative, and he was on good terms with his neighbors.  (R. at 782.) He said that, while he was working, he typically had fair relations with his co-workers, but he did not trust his supervisors.  (R. at 782.)

Generally, Smith found Gardner's interpersonal skills to be limited in some situations by his sympathy for people who were being picked on or treated unfairly. (R. at 782.)  He noted Gardner's fine and gross motor skills appeared to be within normal limits, and he did not seem particularly limited in his ability to understand and remember general items and concepts. (R. at 782.) Therefore, Smith found it reasonable to expect Gardner could comprehend and follow both simple and detailed job instructions.  (R. at 782.)  Concentration and persistence appeared adequate to meet the demands of simple or detailed work-related decisions, and he showed a moderately limited ability to interact with others in an appropriate manner.  (R. at 782.) Gardner could manage his own hygiene, he did not appear limited in his ability to adapt to changes in the workplace, to be aware of normal hazards or to take appropriate precaution. (R. at 782.)  Smith opined that Gardner's physical problems may detract from his ability to maintain attendance and meet an employment schedule.  (R. at 782.)  He diagnosed Gardner with somatic symptom disorder, persistent, mild; other specified anxiety disorder, no persistent concern or maladaptive response; unspecified depressive disorder; and unspecified trauma-related disorder.  (R. at 782.)

On November 5, 2019, Dr. Andrew Bockner, M.D., a state agency physician, completed a PRTF in connection with the reconsideration of Gardner's claim.  (R. at 87-88.)   He opined Gardner was mildly limited in his ability to understand, remember or apply information, to concentrate, persist or maintain pace and to adapt or mange himself; and moderately limited in his ability to interact with others.  (R. at 88.)  Dr. Bockner stated Gardner had diagnoses of PTSD/unspecified trauma disorder; depression; anxiety; and somatic symptom disorder, but he had no history of inpatient treatment and was not on any psychotropic medications.  (R. at 88.)  Dr. Bockner also completed a mental residual functional capacity assessment, opining

Gardner was moderately limited in his ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 90-91.) He opined Gardner's ability to ask simple questions or request assistance and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness were not significantly limited. (R. at 90.) Dr. Bockner opined Gardner had no understanding and memory limitations, no sustained concentration and persistence limitations and no adaptation limitations, and he concluded Gardner could perform simple and complex work directions in a setting with limited contact with the general public. (R. at 90-91.) He stated Gardner's activities of daily living were not severely limiting, and he would be able to perform competitive work with the above mental limitations. (R. at 91.)

On August 4, 2021, Melinda M. Fields, Ph.D., a licensed psychologist, completed a psychological evaluation of Gardner. (R. at 857-63.) Gardner reported living alone and sharing joint custody of his two-year-old son with his son's mother and having his son every other week. (R. at 857.) He denied any inpatient mental health treatment, although he did participate in outpatient mental health treatment through the VA for approximately two months, approximately two years previously. (R. at 859.) Gardner said he began experiencing significant anxiety-related symptoms following his military service, including panic episodes that included hand perspiration and shaking, chest tightness, shortness of breath, racing heart, sensation of a heart attack, inability to relax, fearfulness, abdominal discomfort and feeling out of control. (R. at 859.) He reported difficulty tolerating stores such as Walmart and leaving the store prior to completion of purchases. (R. at 859.) Gardner reported a tendency to ruminate and worry, particularly about his son, and

he reported having "night terrors," during which he "yell[ed] … [and] cuss[ed] in [his] sleep." (R. at 859.) He also reported intrusive recollections associated with his time in Iraq, noting being triggered by large rooms filled with people, cluttered spaces and loud, unexpected noises. (R. at 859.) Gardner stated he was uncomfortable being in a room without his back against the wall and described hyperarousal and being easily startled. (R. at 859.) He described a foreshortened sense of future. (R. at 859.) Gardner reported a depressed mood with irritability and a tendency to isolate, experiencing passive suicidal ideations in the past without plan or intent and no current ideations, and he denied perceptual experiences consistent with psychotic processes. (R. at 859.) He stated he had experienced concerns with social functioning on jobsites, but he denied difficulty reading social cues. (R. at 859.)

Gardner reported having a "pretty good" relationship with his mother, an "okay" relationship with his sister and having little contact with his brother. (R. at 860.) He reported considerable distress over court involvement to obtain joint custody of his son and interactions with his son's mother. (R. at 860.) Gardner reported walking, stretching and doing yoga throughout the day and stated yoga to be his hobby. (R. at 860.) He stated he provided for his son's care during their weeks together and spent all of his time with his son. (R. at 860.) Gardner stated he was responsible for household chores, grocery shopping, food preparation and all hygiene and grooming tasks. (R. at 860.) While he previously enjoyed playing guitar, he reported he had not done this in approximately one year. (R. at 860.) He said his mother visited him, and he occasionally talked with family members and friends by phone. (R. at 860.) Gardner denied involvement with social media, reporting discomfort with this platform, and he denied involvement in church, civic or community activities, noting a tendency to isolate. (R. at 860.) Fields noted

Gardner was generally cooperative; eye contact was minimal; although Gardner was oriented to person, place and time, he did not know the date or day of the week; speech was rambling at times, requiring redirection, and he was very focused on the stress caused by his custody dispute; mood appeared anxious and irritable, with a congruent affect; stream of thought was generally organized and logical, and there was no evidence of a thought content impairment; there was no evidence of perceptual disturbances, such as hallucinations or delusions, but judgment appeared impaired; immediate memory appeared adequate, as evidenced by ability to recite 4/4 words upon immediate presentation; recent recall appeared impaired, as evidenced by ability to recall 1/4 words after a delay; concentration appeared impaired, as evidenced by performance of Serial 3s; and pace appeared normal.  (R. at 860-61.)

Fields administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), on which Gardner obtained a full-scale IQ score of 86, placing him in the low average range of intellectual functioning.  (R. at 861-62.)  She also administered the Minnesota Multiphasic Personality Inventory – Third Edition, ("MMPI-3"), which suggested significant emotional distress and presentation of multiple somatic complaints. (R. at 862.)  Endorsements also suggested significant anxiety, as well as possible post-traumatic distress.  (R. at 862.)  The Beck Depression Inventory, ("BDI"), results were suggestive of significant depressive symptomatology, while the Beck Anxiety Inventory, ("BAI"), results revealed significant anxiety-related symptoms.  (R. at 862.)  Fields diagnosed Gardner with panic disorder; PTSD; major depressive disorder, recurrent, with anxious distress; and somatic symptom disorder.  (R. at 863.)  She deemed his prognosis guarded with appropriate treatment and environmental support.  (R. at 863.)  Fields recommended outpatient mental health treatment with regular psychotherapy.  (R. at 863.)

Fields also completed a mental assessment of Gardner, opining he was mildly limited[5] in his ability to maintain personal appearance; moderately limited[6] in his ability to follow work rules, to function independently, to understand, remember and carry out simple job instructions and to demonstrate reliability; and markedly limited[7] in his ability to relate to co-workers, to deal with the public, to use judgment in public, to interact with supervisors, to deal with work stresses, to maintain attention/concentration, to understand, remember and carry out detailed and complex job instructions, to behave in an emotionally stable manner and to relate predictably in social situations.  (R. at 864-66.)  Fields opined Gardner would miss more than two days of work monthly due to his impairment(s) or treatment.  (R. at 866.) To support her assessment, Fields listed Gardner's impaired social functioning, judgment, concentration, recent and remote recall and memory, as well as his panic attacks, post-traumatic stress symptoms, major depressive symptoms and personality disorder traits. (R. at 864-66.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2022). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a

---

[5] A mild limitation is defined on this assessment as a slight limitation, but the individual still can generally function well. (R. at 864.)

[6] A moderate limitation is defined on this assessment as more than a slight limitation, but the individual still can function satisfactorily. (R. at 864.)

[7] A marked limitation is defined on this assessment as a serious limitation, resulting in a substantial loss in the ability to effectively function and causing unsatisfactory work performance. (R. at 864.)

severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2022).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Gardner argues the ALJ erred by failing to properly determine his residual functional capacity.  (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) Specifically, he argues the ALJ erred by failing to give substantial weight to the VA disability rating and in his consideration of the opinion evidence of record.  (Plaintiff's Brief at 4-6.)

Gardner filed his application in February 2019; thus, 20 C.F.R. § 404.1520c governs how the ALJ considered the medical opinions here.[8] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. § 404.1520c(a) (2022). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2022) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2022).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his

---

[8] 20 C.F.R. § 404.1520c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

decision. *See* 20 C.F.R. § 404.1520c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[9] *See* 20 C.F.R. § 404.1520c(b)(2).

Gardner first argues that the ALJ erred by failing to give great or controlling weight to the VA disability rating, finding him 80 percent disabled, overall, with 70 percent of that attributable to PTSD. He stated that an ALJ may give less weight to a VA disability rating when the record clearly demonstrates that such a deviation is appropriate, but he argued that the ALJ, here, failed to show how the record "clearly demonstrates that such a deviation is appropriate." In making this argument, Gardner cites to the Fourth Circuit case of *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337 (4th Cir. 2012). For the following reasons, I am not persuaded by Gardner's argument. Specifically, the holding in the *Bird* case was superseded, as stated in *Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023). In particular, as noted above, in 2017, the Social Security Administration broadly revised its rules regarding the

---

[9] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(b)(3) (2022).

evaluation of medical evidence, with those new rules being applicable to claims filed on or after March 27, 2017. *See* Revisions to Rules, 82 Fed. Reg. 5844. Relevant here, the new rules identify "[d]ecisions by other governmental agencies and nongovernmental entities" as evidence that is "inherently neither valuable nor persuasive to the issue of whether you are disabled or blind under the [Social Security] Act." *Rogers*, 62 F.4th at 877 (quoting 20 C.F.R. § 404.1520b(c)(1)). This new rule, overturning years of contrary precedent, *see, e.g., Bird*, 699 F.3d 337, now binds this court. Under the new rule, the SSA "will not provide any analysis about how we considered such evidence in our determination or decision…." 20 C.F.R. § 404.1520b(c). Thus, here, the ALJ was under no obligation to afford Gardner's VA disability rating any specific weight, or even to address the determination. *See Rogers*, 62 F.4th at 877 ("[T]he SSA 'will not provide any analysis about how we considered [decisions by other governmental agencies and nongovernmental entities] in our determination or decision.'") (quoting 20 C.F.R. § 404.1520b(c)). Therefore, I find that the ALJ applied the correct legal standard, and he was not obligated to discuss the VA's disability rating. Instead, as the Commissioner stated in her brief, the ALJ did precisely what he was supposed to do – he considered the underlying psychological evidence and treatment notes from the VA, which showed that, although Gardner exhibited a depressed mood at times, his mental status examinations were largely normal. In particular, these examinations revealed he was alert and oriented, well-groomed with appropriate hygiene, pleasant and cooperative; his thought content, thought process and judgment/insight were within normal limits; he had appropriate eye contact; and his speech was within normal limits. (R. at 28, 401, 467-68.) Moreover, as the ALJ stated, throughout the relevant time period, although Gardner experienced stress related to his relationship with his ex-girlfriend, he was building a home for his son, planning for the future, attending court hearings, practicing yoga daily and independently caring for himself and his

young son.  (R. at 29, 410, 781-82, 789.)  As the ALJ correctly explained, the medical evidence of record failed to document any significant mental health treatment in either 2020 or 2021, and Gardner reported he was not taking any medication and was not involved in any inpatient or outpatient programs during an August 2021 psychological evaluation.  (R. at 28.)

For all the above-stated reasons, I find that the ALJ did not err by failing to give significant weight to the VA disability rating, and substantial evidence supports his consideration of the evidence underlying that determination.

Gardner also argues the ALJ erred in his consideration of the opinion evidence in arriving at his residual functional capacity finding.  In particular, he argues the ALJ erred by finding the opinions of psychologists Smith and Fields not persuasive, instead relying on the opinion of Dr. Bockner, a state agency reviewer, who never examined him.  For the reasons that follow, I find that the ALJ did not err in his consideration of the opinion evidence and prior administrative findings and that substantial evidence supports his mental residual functional capacity finding.

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2022). The ALJ found Gardner had the residual functional capacity to perform light work, except he could frequently, but not constantly, reach, handle and finger with the right upper extremity; occasionally overhead reach, bilaterally; have no public interaction; have occasional interaction with others, such as co-workers and supervisors, but largely in brief, superficial contacts; he could have no direct contact with crowds of unfamiliar persons; and he could not work around sudden, excessively loud noises. (R. at 22.)

In October 2019, Smith opined that Gardner could comprehend and follow both simple and detailed job instructions; his concentration and persistence was adequate for both simple and detailed work-related decisions; he had a moderately limited ability to interact with others in an appropriate manner; he could manage his own hygiene; he did not appear limited in his ability to adapt to workplace changes, to be aware of normal hazards or to take appropriate precaution; and Gardner's physical problems may detract from his ability to maintain attendance and meet an employment schedule.  The ALJ stated that Smith's opinion was "persuasive to the extent that it is supported and consistent with other evidence, but has not been adopted in its entirety."  (R. at 30.)  The ALJ further stated that, with regard to Gardner's mental functioning, the proposed limitations generally were supported by Smith's direct observations of Gardner and were consistent with Gardner's somewhat abnormal presentation during encounters at the VA. (R. at 30.) However, it was the final portion of Smith's opinion that the ALJ found unsupported – the statement that Gardner's "physical problems may detract from his ability to maintain attendance and meet an employment schedule."  (R. at 30.)  In particular, the ALJ found this opinion to be "not well explained or quantified," "appears to rely on speculation" and "is also inconsistent with [Gardner's] generally conservative course of treatment for his physical impairments and the overall objective medical evidence. …"  (R. at 30.)  As stated above, Gardner challenges only the ALJ's findings pertaining to his mental impairments on appeal to this court, and the ALJ found persuasive Smith's opinions as they pertained to his mental functioning. Therefore, I find that Gardner's argument that the ALJ erred with regard to his consideration of Smith's opinion is misplaced.

Regarding psychologist Fields, she completed both a psychological evaluation and a mental assessment of Gardner in August 2021.  The ALJ found Fields's

opinion – that Gardner had moderate to marked limitations in making occupational adjustments, moderate to marked limitations in making performance adjustments, mild to marked limitations in making personal/social adjustments and that he would be absent from work more than two days monthly – "not persuasive, as it is extreme and not supported by [Fields's own] largely normal objective examination findings." (R. at 31.)  For instance, although she noted Gardner was appropriately dressed and groomed, she, nonetheless, opined he would have a mild limitation in maintaining personal appearance.  (R. at 31.)  Likewise, although Fields noted Gardner was anxious and irritable regarding the custody situation with his son's mother, he generally was cooperative.  (R. at 31.)  Nevertheless, Fields opined he would be markedly limited in his ability to behave in an emotionally stable manner and to relate predictably in social situations – limitations the ALJ found were not supported by her findings during the evaluation.  (R. at 31.)  The ALJ further correctly noted that, although Gardner made minimal eye contact and had rambling speech at times, his stream of thought generally was organized and logical, and there was no evidence of a thought content impairment. (R. at 31.) Moreover, the ALJ noted that IQ testing placed Gardner in the low-average range of intellectual functioning, and, although Fields indicated Gardner's judgment and concentration were impaired, she provided no details regarding these observations.  (R. at 31.)  According to the ALJ, given such unsupported findings, it appeared that Fields's opinion was based largely on Gardner's subjective reports of symptoms as opposed to her objective findings.  (R. at 31.) I agree.  Therefore, I find the ALJ reasonably concluded Fields's examination findings were insufficient to support the moderate to marked limitations she imposed in nearly all areas of mental functioning.  (R. at 31.)

Moreover, the ALJ found that Fields's opinion was inconsistent with the overall record, which reveals only intermittent and conservative treatment for

Gardner's mental health impairments, with no treatment being rendered in 2020 or 2021. (R. at 31.) However, despite this lack of regular treatment, the ALJ correctly noted that Gardner did not require any emergent treatment or inpatient psychiatric hospitalizations for his mental health conditions. (R. at 31.) The ALJ also found that Gardner's reported activities of daily living, which included living independently and caring for his two-year-old son every other week, were inconsistent with Fields's opined limitations. (R. at 31.) Specifically, the ALJ stated that such activities evidenced a level of functioning that exceeded Fields's opined moderate to marked limitations. (R. at 31.)

I find that all of these reasons support a finding that the ALJ properly considered Fields's opinion, and substantial evidence supports his conclusion that neither Fields's objective findings nor the overall evidence of record supports the imposition of moderate to marked limitations in nearly all mental functional activities.

Lastly, and contrary to Gardner's argument, I find that the ALJ did not err in his consideration of the state agency reviewer's prior administrative finding. First, he argues that the ALJ erred by "relying" on Dr. Bockner's findings. This, however, simply is incorrect, as the ALJ stated in his decision he found the assessment "persuasive to the extent that it is supported and consistent with other evidence, *but has not been adopted in its entirety*." (R. at 30) (emphasis added). Thus, contrary to Gardner's contention, the ALJ did not "rely" on Dr. Bockner's assessment. Next, he takes issue with the fact that Dr. Bockner did not examine him. However, the regulations recognize "State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a(3)(b)(1) (2022); Social Security Ruling, ("S.S.R."), 96-6p, WEST'S

SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating and examining sources.").

In November 2019, Dr. Bockner opined that Gardner was mildly limited in his ability to understand, remember or apply information, to concentrate, persist or maintain pace and to adapt or manage himself; and moderately limited in his ability to interact with others. In a mental residual functional capacity assessment, Dr. Bockner similarly opined Gardner was moderately limited in his ability to interact appropriately with the general public; to accept instruction and respond appropriately to criticism from supervisors; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. He also noted that Gardner's activities of daily living were not severely limited. Dr. Bockner opined Gardner could perform simple and complex work directions in a setting with limited contact with the general public. As stated above, the ALJ found this assessment was "persuasive to the extent that it is supported and consistent with other evidence, but has not been adopted in its entirety." (R. at 30.) The ALJ explained that Dr. Bockner's assessment was supported, insofar as he aptly considered Gardner's documented mental health complaints and treatment, together with evidence regarding his activities of daily living and observed mental status over time. (R. at 30.) Specifically, Dr. Bockner noted Gardner had no history of inpatient treatment and was not taking any psychotropic medications for his diagnosed PTSD/unspecified trauma disorder; depression; anxiety; and somatic symptom disorder. (R. at 88.) Dr. Bockner noted previous psychological appointments at the VA during which Gardner demonstrated disorganized thoughts, loose associations and had said some bizarre and concerning things. (R. at 90-91.) However, he further

noted that Gardner's mental status at a more recent consultative examination was much improved, and he was able to interact in a normal manner.  (R. at 90-91.) Nonetheless, the ALJ concluded that Dr. Bockner's opinion was not entirely consistent with other evidence, noting that the record as a whole did not support even a mild limitation in the area of understanding, remembering or applying information. (R. at 30.)  In particular, the ALJ stated that, among other things, Gardner's broad activities of daily living and grossly normal memory and cognition, as noted in the October 2019 consultative examination, reflected no significant limitation in this area.  (R. at 30.)  The ALJ, however, concluded that Gardner was limited to no interaction with the public, occasional interaction with others in predominantly brief, superficial contacts and no direct contact with crowds of unfamiliar persons, considering his somewhat abnormal mental status in various encounters and other evidence.  (R. at 30.)  For instance, in February 2019, Gardner's speech was pressured and disorganized, and he was tearful at times.  He was very anxious and disorganized during his initial encounter with Cook, and she noted deficits in judgment and insight.  In March 2019, Gardner had a dysphoric mood with congruent affect, and thought processes were circumstantial, vague in content and marked by magical thinking.

For all these reasons, I find that the ALJ appropriately considered the prior administrative finding rendered by Dr. Bockner, and substantial evidence supports his conclusion that it was persuasive to the extent it was supported and consistent with other evidence.

Based on all the above-stated reasons, I find that the ALJ properly considered the opinion evidence pertaining to Gardner's mental impairments.  Based on the

same reasoning, I also find that the ALJ's mental residual functional capacity finding also is supported by substantial evidence.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's mental residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Gardner was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Gardner's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or

recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    June 15, 2023.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE